UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 14-CV-3843 (JFB)
_____

THOYWELL H. THOMPSON, JR.,

Plaintiff,

VERSUS

CAROLYN COLVIN, COMMISSIONER OF SOCIAL SECURITY,

Defendant.
_____

**MEMORANDUM AND ORDER**
September 14, 2015
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Thoywell H. Thompson ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of the Acting Commissioner of Social Security ("defendant" or "Commissioner") denying plaintiff's application for a period of disability and disability insurance benefits ("DIB"). An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform light work as defined by 20 CFR 404.1567(b), though he requires proximate bathroom access at all times. The ALJ further found that, based on his residual functional capacity, plaintiff is capable of performing past relevant work and that, in the alternative, there are a significant number of jobs in the national economy that plaintiff could also perform. Therefore, the ALJ determined that plaintiff is not disabled. The Appeals Council denied plaintiff's request for review.

The Commissioner moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes and cross-moves for judgment on the pleadings, alleging that the ALJ erred by: (1) failing to accord the proper weight to the opinion of plaintiff's treating physician; (2) arbitrarily excluding an expert vocational evaluation; and (3) failing to take into account the interplay of plaintiff's kidney stones post prostatectomy. For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied, plaintiff's cross-motion for judgment on the pleadings is denied, and plaintiff's motion to remand is granted. Accordingly, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Remand is warranted because the ALJ did not properly weigh the opinion of the treating physician, Dr. Richstone, and failed to recontact him for clarification of the record. It is well settled that the ALJ must recontact the treating physician where, as here, the

physician's information is determined to be unclear or inadequate to determine whether the claimant is disabled. Thus, although there is evidence in the record from other doctors to support the ALJ's finding, the ALJ should have recontacted the treating physician, Dr. Richstone, for clarification of the reasons for his opinion before deciding to disregard it. Accordingly, a remand on that issue is warranted.[1]

I. BACKGROUND

A. Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation of the facts is contained in the parties' submissions to the Court and is not repeated herein.

1. Personal History

Plaintiff was born on March 20, 1959, making him fifty-one years old on the amended alleged disability onset date. (AR at 20.) Plaintiff has a high school education, completed one year of college and has a history of employment as a New York City police detective, a private investigator and a protection agent for children's services. (*Id.* at 31, 160, 181). Plaintiff has not worked successfully since his amended alleged disability onset date. (*Id.* at 38.) Plaintiff lives with his wife and two dogs and reported no problems with personal care. (*Id.* at 31, 171.) Plaintiff's activities include attending physical therapy twice weekly, household chores (cleaning, laundry, washing dishes, light repairs, preparing some meals), watching television, and occasionally going on shopping trips and driving his wife to work. (*Id.* at 170-73.) Plaintiff could perform activities of daily living, but is limited to driving twenty to twenty-five minutes and walking one hundred yards due to necessary bathroom breaks and/or rest due to fatigue. (*Id.* at 55, 175-76.)

2. Work History

Plaintiff worked for the New York Police department from 1985 to 2005. (*Id.* at 32, 181.) He was a detective for approximately fifteen of those years. (*Id.*) As a detective, plaintiff stated that, on a daily basis: he walked, stood, sat, and climbed for more than five hours; he handled, grabbed, or grasped large objects and reached for two hours, and he stooped over at the waist, kneeled, and crouched for one hour. (*Id.* at 182.) He wrote, typed, or handled small objects for over five hours and frequently lifted items, such as files and boxes, less than ten pounds. (*Id.*) After retiring from the NYPD—originally under a "service retirement," which was changed to a disability retirement though a "World Trade Center conversion" after plaintiff, a 9/11 first responder, was diagnosed with cancer—plaintiff worked for a private investigation firm, for a short time, followed by a job with the New Hyde Park Garden City Park School District as an investigator. (*Id.* at 33.)

Between November 2006 and December 2007, plaintiff worked at a private investigation firm as the director of technical services. (*Id.* at 183.) At the investigation firm, plaintiff worked five hours a day, five days per week. (*Id.*) He walked for two hours, stood for four hours, sat for one hour, kneeled and crouched for one hour, reached for two hours and wrote, typed or handled small objects for two hours in the workday. (*Id.*) He did not climb, crawl or handle large objects. (*Id.*) The heaviest object he lifted was less

---

[1] Because the Court determines that this case should be remanded for the reasons discussed herein, the Court need not and does not address plaintiff's argument that the ALJ arbitrarily excluded Mr. Pasternak's expert vocational evaluation.

than ten pounds and he did so frequently. (*Id.*)[2]

Between January 2008 and August 2011, plaintiff worked as a full-time investigator/protection agent for the New York City Administration for Children's Services. (*Id.* at 35, 184.) As an investigator, plaintiff walked for two hours, stood for one hour and sat for six hours. (*Id.* at 184) He generally did not climb, kneel, crouch, crawl, reach, handle, or stoop. (*Id.*) He wrote, typed, or handled small objects for six hours and frequently lifted items such as reports and files weighing less than ten pounds. (*Id.*)

Plaintiff took a leave from work prior to undergoing surgery in November 2010 for his prostate cancer. (*Id.* at 36.) In February 2011, a few months after the surgery, plaintiff returned to his position at Children's Services, and continued working there until August 2011. (*Id.* at 35-36.) Plaintiff testified that when he returned to work after the surgery, the firm accommodated him by giving him a desk job and allowed him to be near a bathroom. (*Id.* at 36-37.) However, plaintiff's employers could no longer provide the accommodation after August 2011, therefore making it too difficult to work there. (*Id.* at 36-38.) Plaintiff stated that he would probably still be working at New York City's Children's Services if he had the accommodation, although he would need to interrupt phone calls or interviews for bathroom breaks at least three times per day. (*Id.* at 38, 61-62.) Plaintiff testified that when he was on the job, he would constantly think about his next bathroom visit, which interfered with his ability to do his job. (*Id.* at 63-64.)

### 3. Medical History

In February and August 2009, renal ultrasounds performed on plaintiff revealed kidney stones (or renal calculi). (*Id.* at 357-58.) In December 2009, plaintiff had a follow-up examination due to his history of renal calculi, during which a sonographic evaluation demonstrated another calculus in his left kidney. (*Id.* at 350.)

In March 2010, after some abnormal test results, plaintiff's urologist Dr. Lee Richstone ("Dr. Richstone") ordered a biopsy of plaintiff's prostate to evaluate the possibility of cancer; the results at that time were inconclusive, though "atypical and suspicious for adenocarcinoma." (*Id.* at 340-41.) On April 10, 2010, plaintiff visited Dr. Richstone, who diagnosed him with right renal colic due to a stone in his right kidney. (*Id.* at 390.) Plaintiff was given prescriptions and discharged the next day. (*Id.*)

On September 17, 2010, plaintiff visited the Smith Institute for Urology ("Smith Institute") for a follow-up with Dr. Richstone, during which they reviewed an abnormal magnetic resonance imaging scan that suggested plaintiff had prostate cancer. (*Id.* at 252.) Dr. Richstone recommended a second biopsy to better quantify the extent of the cancer. (*Id.*) The biopsy occurred on October 18, 2010, revealing adenocarcinoma of the prostate. (*Id.* at 259.) Plaintiff returned to Dr. Richstone on October 22, 2010, who diagnosed him with Gleason 7 disease (a form of prostate cancer); plaintiff opted to pursue surgery via robotic prostatectomy. (*Id.* at 251.) On November 8, 2010, a computerized tomography and nuclear whole

---

[2] For brief periods in 2006 and 2008, respectively, plaintiff also worked as the district supervisor for attendance at the New Hyde Park Garden City Park School District and as a security officer for North Shore Hospital in Manhasset. (*Id.* at 33-35, 182.)

body bone scans of plaintiff revealed no evidence of metastatic disease or osseous metastasis. (*Id*. at 264-66.)

On November 30, 2010, plaintiff underwent a robot assisted laparoscopic radical prostatectomy at North Shore University Hospital. (*Id*. at 371-83.) On January 20, 2011, plaintiff had a follow-up visit with Dr. Richstone. (*Id*. at 250.) At that visit, Dr. Richstone noted that plaintiff was doing well and had essentially full urinary control for six weeks, but was wearing a pad for safety. (*Id*.) Following this visit, Dr. Richstone wrote a letter stating that plaintiff was still recovering from the operation, and he recommended that plaintiff remain out of work until February 24, 2011, at which point he should be able to return to work without limitations. (*Id*. at 253.)

On April 21, 2011, plaintiff had another follow-up visit with Dr. Richstone. (*Id*. at 248-49.) Plaintiff's physical examination was normal, and he complained of some erectile dysfunction and mild incontinence. (*Id*.) Dr. Richstone stated that plaintiff had "good functional recovery from his prostatectomy with excellent and improved urinary control." (*Id*.) Plaintiff stated he continued to wear pads during the day because he would leak in significant volumes if he coughed or sneezed. (*Id*.) Dr. Richstone stated that plaintiff had a "fairly good" functional outcome and would likely wean away from the pads over the next six to eight months. (*Id*.)

On July 28, 2011, plaintiff returned for another follow-up with Dr. Richstone. (*Id*. at 247.) Dr. Richstone wrote in his visit summary that plaintiff was "doing nicely" after the prostactectomy, and that he was "nearly fully continent" and not wearing any pads. (*Id*.) Plaintiff's erectile dysfunction also demonstrated improvement with medication. (*Id.*) Dr. Richstone stated that

plaintiff's Prostate Specific Antigen ("PSA") was undetectable and that plaintiff would have a follow up in three months. (*Id*.)

On September 12, 2011, Dr. Alexander Lee, ("Dr. Lee") of North Shore University Hospital, examined plaintiff. (*Id*. at 243-46.) Dr. Lee had been treating plaintiff since October 2007, with visits occurring approximately every six months, most recently in May 2011. (*Id*. at 243.) Dr. Lee was treating plaintiff medically for hypertension, dyslipidemia, and aortic stenosis, and gave plaintiff a good prognosis from a cardiac perspective. (*Id*. at 243-44.)

On April 3, 2012, at the request of plaintiff's attorney for the purposes of plaintiff's Social Security application, Dr. Richstone completed a "Bladder Problem Questionnaire" (the "April 2012 Report"). (*Id*. at 226-29, 415-18). Dr. Richstone stated that plaintiff's diagnoses were prostate cancer, incontinence, and urinary frequency, and his symptoms were incontinence and urinary frequency/urgency, with incontinence being the primary diagnostic finding/clinical sign. (*Id.* at 226.) Dr. Richstone stated that plaintiff's prognosis was good, and that he was not a malingerer or affected by emotional factors. (*Id*. at 226-27.) Dr. Richstone stated that plaintiff's symptoms frequently interfered with his attention and concentration. (*Id*. at 227.) Dr. Richstone estimated that plaintiff needed to urinate approximately every ten to forty-five minutes, and was incontinent once a day involving half a cup of urine. (*Id.*) Dr. Richstone reported that plaintiff's symptoms were relieved with dehydration and worsened when he drank fluids, which was necessary in order to manage his kidney stones. (*Id*. at 227-28.) Based upon his interview and discussion with plaintiff, Dr. Richstone found that plaintiff was capable only of low stress work. (*Id*. at 228.) Dr. Richstone also stated that plaintiff would need a job that provided

4

ready access to a restroom, and that plaintiff would need unscheduled five-minute bathroom breaks approximately every hour. (*Id.*) Dr. Richstone estimated plaintiff would daily need to clean himself and change clothes due to urinary incontinence, but would not miss work as a result of his impairments or treatment. (*Id.* at 228-29.) The doctor stated that plaintiff should not perform heavy lifting, straining, or frequent rising from a seat. (*Id.* at 229.)

The Commissioner obtained two consultant reviews of plaintiff's medical records. Dr. Homayoon Moghbeli ("Dr. Moghbeli"), an internal medicine specialist who consults for the Social Security Administration ("SSA") reviewed plaintiff's medical records in May 2012 and completed an assessment. (*Id.* at 211-19.) Dr. Moghbeli did not examine plaintiff, but asserted that plaintiff could stand or walk for about six hours and sit for about six hours during an eight-hour workday. (*Id.* at 213.) Dr. Moghbeli believed that plaintiff should have no limitations in pushing or pulling and could occasionally climb ladders, ropes, or scaffolds. (*Id.* at 213-14.) He believed plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch or crawl, and that plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. (*Id.* at 213-14.) Dr. Moghbeli did not discuss at any point plaintiff's need for proximity to a bathroom during the workday.

On September 23, 2012, Dr. George Decherd ("Dr. Decherd"), a consulting urologist for the SSA, reviewed plaintiff's medical records and completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form (consisting mostly of questions requiring check-the-box responses) regarding plaintiff's ability to perform work-related physical activities. (*Id.* at 427-32, 437.) Dr. Decherd also did not examine plaintiff, but concluded that plaintiff could lift and carry up to ten pounds continuously and up to twenty pounds frequently. (*Id.* at 427.) He concluded plaintiff could sit for four hours and stand/walk for two hours at a time without interruption, or plaintiff could sit for eight hours and stand/walk for six hours in the aggregate during a work day. (*Id.* at 428.) Dr. Decherd found plaintiff could reach, handle, finger, feel, and push or pull continuously with both hands, and had no limitations in his upper extremities. (*Id.* at 429.) Dr. Decherd believed plaintiff could frequently climb ramps, stairs, ladders, or scaffolds and continuously balance, stoop, kneel, crouch, and crawl, and that he had no document postural limitations. (*Id.* at 430.) Dr. Decherd checked boxes indicating that plaintiff could continuously operate a motor vehicle and continuously be exposed to moving mechanical parts, humidity, wetness, dusts, odors, fumes, pulmonary irritants, extreme cold, extreme heat and vibrations.[3] (*Id.* at 431.) Dr. Decherd opined that plaintiff needed to wear pads, have access to a bathroom and have the ability to take five-minute bathroom breaks four to five times a day.[4] (*Id.* at 432.)

---

[3] The Court notes that, in this section on this form regarding plaintiff's ability to tolerate exposure to various conditions, Dr. Decherd checked the "continuously" box for the row for "others (identify)" after a long sequence of checking "continuously" for other conditions. (AR at 431.) Dr. Decherd, however, failed to list what, if any, conditions he believed plaintiff could be continuously exposed. (*Id.*) He also failed to list the medical findings supporting his assessments in areas of the form where they were requested. (*See id.* at 431-32.) It therefore appears to the Court that Dr. Decherd did not use the utmost care while filling out his report.

[4] Dr. Decherd also completed an interrogatory at the request of the ALJ. (AR at 434-36.) Dr. Decherd asserted that plaintiff's impairments did not meet the criteria for listing, but opined that plaintiff was functionally restricted by his urinary frequency and incontinence, needed frequent bathroom breaks (four

5

### 4. Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified before the ALJ on August 29, 2012. (*Id.* at 27.) Plaintiff stated that he underwent surgery on November 30, 2010, for his prostate cancer and that he is now cancer-free. (*Id.* at 30, 41.) Plaintiff further testified, however, that following the surgery, his bladder issues (such as urinary frequency and incontinence) still remained. (*Id.* at 41-42.)

Plaintiff stated that he had no urinary frequency problems prior to his surgery on November 30, 2010. (*Id.* at 58.) In regards to his post-surgery urinary frequency, plaintiff stated that in a 24-hour day, he would use the restroom on average fifteen times, and could use it up to fifteen times in a typical working day (8:00 am to 6:00 pm). (*Id.* at 42-43.) Plaintiff stated that, at a "bare minimum," he would need to use the restroom every hour. (*Id.* at 43.) Regarding his incontinence, plaintiff testified that if he was not in close proximity to a bathroom, he would suffer an accidental loss of bladder control (causing a need to change clothes) on a daily basis. (*Id.* at 44-45.) The risk of such incidents was lessened by easy access to a bathroom, however. (*Id.* at 45.) Plaintiff stated that he generally brings a change of clothing and wears a pad when going on trips longer than fifteen or twenty minutes, and lines himself with some toilet tissues for shorter trips. (*Id.* at 46-47.)

Plaintiff stated that he has no pain associated with his condition, but that painful urination could occur if he is suffering from a kidney stone. (*Id.* at 47.) Plaintiff testified that he had six or seven episodes of kidney stones since his surgery in November 2010, the last two being in February and April 2012. (*Id.* at 59.) He further stated that the kidney stones happen in clusters and are unpredictable. (*Id.*) Plaintiff said that, in order to prevent a recurrence, he must keep himself hydrated by drinking up to two or three liters of water a day, which contributes to his urinary frequency and incontinence. (*Id.* at 48, 60.)

Plaintiff further testified that even when he is not using the bathroom at work, the anticipation of his next bathroom visit will be on his mind, which can affect his concentration on the job. (*Id.* at 51-52.) Upon returning to work after the prostatectomy, plaintiff stated that he would constantly be thinking about his next bathroom visit in fear of soiling himself, causing him to be less productive and to lag behind on his work. (*Id.* at 65.) Additionally, plaintiff testified that he would have to interrupt an interview to use the restroom at least three times a day. (*Id.* at 62.) Plaintiff testified that in the six month period in which he returned to work after the surgery, he would wear a pad every day to contain the accidents, but that he did have an accident one time when he ran out of a pad that had already been soiled. (*Id.* at 62-63.) In response to a proposed hypothetical work setting by the ALJ, where plaintiff would be an investigator in close proximity to a bathroom at all times, plaintiff testified that he could do the work, but that there would be an issue of continuity because of necessary bathroom breaks. (*Id.* at 61.) Specifically, he stated that such interruptions might cause him to lose some pertinent facts and information from the interview. (*Id.*) Plaintiff also noted that the professional attire he has to wear to work, such as a belt and generally tighter clothing, can affect his frequent urination. (*Id.* at 54.) Additionally, plaintiff said that he would leak if he bends over too far (bending over to the floor or squatting at

---

to five times a day), and could not perform heavy lifting or straining. (*Id*. at 435-36.)

the knees), lifts something too heavy (approximately twenty pounds), sits or stands up too quickly or frequently, or sits or stands for greater than fifteen minutes at a time. (*Id*. at 51-53.) Plaintiff stated that he has other health issues, but that he did not think they would affect his ability to work. (*Id*. at 49.)

In terms of living at home, plaintiff testified that he could do all daily activities such as dress, bathe, cook, clean, shop, and drive, but is limited in how long he can do each. (*Id.* at 55.) Plaintiff testified that he could not drive more than twenty to twenty-five minutes before needing a bathroom break. (*Id.* at 30, 55.) He testified that he had recently driven to North Carolina, which took him between ten and eleven hours (instead of approximately eight hours) due to frequent bathroom stops at the rest areas or along the side of the road when no rest area was available. (*Id.* at 55-56.)

B. Procedural History

On August 17, 2011, plaintiff filed a Title II application for a period of disability and disability insurance benefits ("DIB") alleging disability since August 11, 2011, due to prostate cancer with a Gleason score of 7, aortic stenosis, and kidney stones. (*Id*. at 13, 143-44, 159.) Plaintiff's application was initially denied on October 19, 2011, and on November 29, 2011, he filed a written request for an administrative hearing. (*Id*. at 13, 68, 70-71.) After due notice, plaintiff appeared with his attorney, Aba Heiman ("Mr. Heiman") and testified before the ALJ on August 29, 2012. (*Id*. at 13, 27-67.) After the hearing, plaintiff and his counsel amended the alleged disability onset date to November 29, 2010. (*Id*. at 13, 198-99.) Additionally, the ALJ sent the plaintiff's medical records and medical interrogatory to urologist and medical expert, Dr. Decherd, and the completed interrogatory was proffered to the plaintiff's attorney with no response. (*Id*. at 13, 200-03, 427-37.)

On January 10, 2013, the ALJ issued a decision finding Plaintiff not disabled under the Act. (*Id*. at 13-22.) Plaintiff requested review by Appeals Council, and on June 4, 2014, the Appeals Council denied Plaintiff's request, rendering the ALJ's decision the final decision of the Commissioner. (*Id*. at 1-4, 6-9.) Plaintiff filed this action on June 19, 2014. The Commissioner served the administrative record and filed an answer on September 19, 2014.

II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec*., 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force,

7

the court should not substitute its judgment for that of the Commissioner.").

### III. DISCUSSION

#### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

#### B. Analysis

According to plaintiff, the ALJ's decision is not supported by substantial evidence and is the result of legal error. Specifically, Plaintiff argues that the ALJ failed to apply the "treating physician rule" to the medical opinion of Dr. Richstone by not giving his opinion "controlling weight." As set forth below, the Court concludes that the ALJ failed to recontact Dr. Richstone, plaintiff's treating physician, to further develop the record and therefore improperly gave his opinion less weight. Therefore, the case must be remanded for further development of the record and for clarification of Dr. Richstone's opinion, so that the ALJ may make a proper disability determination.

8

### 1. The ALJ's Decision

Here, in concluding that plaintiff was not disabled under the SSA, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefits. (*See* AR at 12-23.)

#### a. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities," *id.* § 404.1572(a), and gainful work activity is work usually done for pay or profit, *id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity. Here, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 29, 2010. (AR at 15.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

#### b. Severe Impairment

At step two, if the claimant is not employed, the ALJ determines whether the claimant has a "severe impairment" that limits his capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46. An impairment or combination of impairments is "not severe" when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. *See* 20 C.F.R. § 404.1521.

In this case, the ALJ found that plaintiff had the following severe impairments: urinary urgency and frequency post-prostate surgery and history of kidney stones. (AR at 15.) The ALJ noted that, although the plaintiff had been medically managed for aortic stenosis, hypertension, and hyperlipidemia, these conditions are only briefly mentioned in the record and there is not enough documentation to show that these conditions rise to the level of a severe impairment. (*Id.* at 16.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

#### c. Listed Impairment

At step three, if the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ found that none of these impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 17.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness.

#### d. Residual Functional Capacity and Past Relevant Work

If the severe impairments do not meet or equal a listed impairment, the ALJ assesses the claimant's residual functional capacity, in light of the relevant medical and other evidence in the claimant's record, in order to determine the claimant's ability to perform his past relevant work. 20 C.F.R. § 404.1520(e). The ALJ then compares the claimant's residual functional capacity to the physical and mental demands of his past relevant work. 20 C.F.R. § 404.1520(f). If the claimant has the ability to perform his past relevant work, he is not disabled. *Id.*

9

In this case, relying primarily on the opinions of Dr. Decherd and Dr. Moghbeli, the ALJ found that plaintiff has "the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), because the claimant is able to lift and/or carry up to twenty pounds frequently and up to ten pounds continuously, stand and walk for six hours each in an eight-hour workday, and sit for eight hours in an eight-hour workday. The claimant is able to frequently climb stairs, ramps, ladders, and scaffolds, and he is able to frequently tolerate exposure to unprotected heights. Additionally, the claimant requires proximate bathroom access." (AR at 17.) The ALJ further found that plaintiff is capable of performing past relevant work as a detective and investigator. (*Id*. at 17-20.) The ALJ found that this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (*Id.*) The ALJ stated that although "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible." (*Id*. at 18.) Therefore, the ALJ concluded that plaintiff had not been under a disability as defined in the Social Security Act subsequent to his prostatectomy, and was not entitled to benefits. (*Id.* at 21.) The parties dispute the correctness of this conclusion and the thoroughness of the ALJ's analysis.

In reaching this conclusion, the ALJ rejected the opinion of Dr. Richstone, plaintiff's treating physician, that plaintiff must keep drinking liquids for management of kidney stones, has present symptoms of incontinence, urinary frequency (of every ten to forty-five minutes), and urinary urgency. (*Id*. at 226-28.) Additionally, the ALJ disregarded Dr. Richstone's opinion that plaintiff's symptoms were severe enough to frequently interfere with attention and concentration, that plaintiff requires ready access to a restroom, and that plaintiff has to clean up and change after accidents that may occur daily. (*Id.*).[5]

For the reasons set forth *infra*, the Court discerns legal errors in connection with the ALJ's assessment of plaintiff's residual functional capacity, and, in light of those errors, a remand is necessary because the Court cannot determine whether substantial evidence supports the decision. *See Branca v. Comm'r of Soc. Sec.*, No. 12-CV-643 (JFB), 2013 WL 5274310, at *11 (E.D.N.Y. Sept. 18, 2013).

e. Other Work

At step five, if the claimant is unable to perform his past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that claimant can perform. *Id.* § 404.1560(c); *see, e.g., Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998).

Here, the ALJ found that plaintiff was able to perform his past relevant work, but found in the alternative that "considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform." (AR at 20.) The ALJ also considered plaintiff's age, education, work experience, and residual functional capacity, in connection with the Medical-Vocational

---

[5] Defendant does not dispute that Dr. Richstone was plaintiff's "treating physician" and argues instead that the ALJ properly gave Dr. Richstone's opinion less than controlling weight. (*See* Def.'s Br. at 12-15.)

Guidelines set forth at Appendix 2 of Part 404, Subpart P of Title 20 of the Code of Federal Regulations, and found that "there is no evidence that claimant's need for proximate bathroom access would significantly interfere with the claimant's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." (*Id.* at 21.) Therefore, the ALJ found that plaintiff was not disabled under Medical-Vocational Rule 202.14. (*Id.*)

Plaintiff challenges the correctness of this conclusion to the extent it is based on the alleged failure to properly weigh Dr. Richstone's opinion.[6]

### 2. Treating Physician Rule

Plaintiff argues, among other things, that the ALJ failed to accord the proper weight to his treating physician, Dr. Richstone. The Court agrees that the ALJ failed to apply the proper standard for evaluating the medical opinion of Dr. Richstone, and remands the case on this basis.

#### a. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

Although treating physicians may share their opinion concerning a patient's inability to work and the severity of disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability."). When the Commissioner decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R § 404.1527(c)(2); *see Perez v. Astrue*,

---

[6] Again, because the Court determines that this case should be remanded for the ALJ's failure to properly evaluate Dr. Richstone's opinion, the Court need not and does not address plaintiff's alternative argument regarding the vocational evaluation.

No. 07-CV-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources.") (internal citation and quotation marks omitted). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell*, 177 F.3d at 133.

"'Furthermore, the ALJ has the duty to recontact a treating physician for clarification if the treating physician's opinion is unclear.'" *Stokes v. Comm'r of Soc. Sec.*, No. 10-CV-0278 (JFB), 2012 WL 1067660, at *11 (E.D.N.Y. Mar. 29, 2012) (quoting *Ellett v. Comm'r of Soc. Sec.*, No. 1:06–CV–1079 (FJS), 2011 WL 1204921, at *7 (N.D.N.Y. Mar. 29, 2011)); *see also Mitchell v. Astrue*, No. 07 Civ. 285 (JSR), 2009 WL 3096717, at *17 (S.D.N.Y. Sept. 28, 2009) ("If the opinion of a treating physician is not adequate, the ALJ must 'recontact' the treating physician for clarification." (citing 20 C.F.R. §§ 404.1512(e), 416.912(e))). Such an obligation is linked to the ALJ's affirmative duty to develop the record.[7] *See Perez*, 77 F.3d at 47.

b. Analysis

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Richstone, the treating physician. Specifically, he perfunctorily decided to give little weight to Dr. Richstone's opinion—solely on the basis of statements in the April 2012 Report that the ALJ viewed as internally inconsistent and inconsistent with earlier treatment notes (AR at 19)—without evaluating his opinion pursuant to the factors detailed in *Halloran* or recontacting him for clarification, and instead simply assigned more weight to Dr. Decherd's and Dr. Moghbeli's opinions.[8]

---

[7] It is well established that the ALJ must "'[a]ffirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). The ALJ's regulatory obligation to develop the administrative record exists even when the claimant is represented by counsel or by a paralegal at the hearing. *Rosa*, 168 F.3d at 79.

[8] The Court also notes that the ALJ accorded "significant weight" to the opinion of Dr. Moghbeli "due to his programmatic expertise, his review of the claimant's medical records, and the relative consistency of his opinions with the overall medical evidence, although Dr. Moghbeli did not fully address the claimant's need for proximate bathroom access." (AR at 19.) This mostly boilerplate explication of the reasons for giving Dr. Moghbeli's opinion greater

12

The ALJ criticized Dr. Richstone on two grounds: first, in his April 2012 Report, Dr. Richstone stated that plaintiff's symptoms would interfere with his concentration, and he estimated that plaintiff needs to urinate approximately every ten to forty-five minutes; the ALJ found that this purportedly contradicted Dr. Richstone's subsequent response to a question in the same report as to how often plaintiff would require "unscheduled restroom breaks," to which he replied "every hour." (*Id.* at 19, 227-28.) Second, the ALJ contended that Dr. Richstone had previously indicated in his July 28, 2011 treatment notes that plaintiff was doing well after surgery, is nearly fully continent and no longer wears pads, which also contradicted the conclusions in the April 2012 Report. (*Id.* at 19, 247.) These were the stated bases for the ALJ's assigning Dr. Richstone's opinion reduced weight. (*Id.* at 19.)

The Court finds this rationale to be entirely inadequate. The first purported inconsistency is minimal. The variance between the frequencies stated by Dr. Richstone is not extreme; moreover, his answer to the second question was with respect to *unscheduled* restroom breaks. It is unclear whether Dr. Richstone included some measure of other restroom breaks in his earlier estimate as to how often plaintiff must urinate generally (and the question by no means excludes that possibility), and that the overall frequency of plaintiff's urination would significantly affect his concentration at work. Second, although there does appear to be some inconsistency between the April 2012 Report and the treatment notes from approximately nine months earlier, as discussed further *infra*, it is unclear whether events during that period of time caused plaintiff's symptoms to worsen.

Furthermore, the ALJ failed to address other aspects of the significance of Dr. Richstone's opinion under *Halloran*. The opinion of a treating physician such as Dr. Richstone, under the law, cannot be discarded lightly. Dr. Richstone treated the plaintiff for an extended period of time, beginning in February 2010. (*Id.* at 9.) He performed plaintiff's prostatectomy in November 2010, and performed numerous physical examinations and numerous tests during his follow-up treatment of plaintiff. (*Id.* at 225-54, 379.) Moreover, he is a specialist in the pertinent field (urology). (*Id.* at 19.) Given Dr. Richstone's expertise, his longstanding treatment of plaintiff and the physical examinations and tests that he performed, and his opinion's overall consistency with the medical record, the ALJ should have recontacted Dr. Richstone before according his opinion reduced weight due to purported inconsistencies.

The failure to recontact is especially apparent with respect to the purported inconsistency between the April 2012 Report and Dr. Richstone's July 2011 notes. The July 2011 notes describe improvement in plaintiff's urinary incontinence and his diminished use of pads following the prostatectomy. (*Id.* at 225-47.) In the April 2012 Report, however, Dr. Richstone lists present symptoms as "incontinence, frequency, urinary urgency," stating that plaintiff's urinary incontinence is made better by "dehydration," and that "drinking fluids which is necessary for management of stones" exacerbates his urinary incontinence. (*Id.* at 227-28.) In light of plaintiff's documented history of kidney stones prior to July 2011 (*see id.* at 349, 356-59, 367, 373,

---

weight omits the fact that Dr. Moghbeli (a medical consultant for the SSA) is not a specialist in urology like Dr. Richstone, plaintiff's treating physician, but is instead an "internal medicine" specialist. (*Id.* at 211.)

390) and plaintiff's testimony at the hearing regarding his chronically recurring kidney stones including episodes in 2012 (*id.* at 47-48, 59), it seems that plaintiff's condition may have worsened subsequent to the July 2011 treatment notes, but there is no specific intervening event that would provide a clear explanation of how that occurred.[9]

Thus, in light of the ALJ's conclusion that Dr. Richstone's opinion was inconsistent with prior treatment notes and inconsistent when compared to Dr. Decherd's and Dr. Moghbeli's opinions, a remand is necessary so that Dr. Richstone can be recontacted and be given the opportunity to supplement the record with any additional clarification or bases for his longstanding opinion regarding plaintiff's disability. Once Dr. Richstone is recontacted and given that opportunity, the ALJ can again examine Dr. Richstone's opinion in light of all the evidence in the record, including Dr. Decherd's and Dr. Moghbeli's respective findings. *See Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *see also Papadopoulos v. Astrue*, No. 10 Civ. 7980 (RWS), 2011 WL 5244942, at *8 (S.D.N.Y. Nov. 2, 2011) ("Because 'further findings' would so plainly help to assure the proper disposition of [Plaintiff's] claim, remand is appropriate in this case." (quoting *Pratts*, 94 F.3d at 39)); *Taylor v. Astrue*, No. CV-07-3469 (FB), 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008) ("[A]lthough an ALJ may elect not to assign controlling weight to the opinion of a treating physician where it is not well-supported by objective evidence, before reaching this conclusion, 'the adjudicator must make every reasonable effort to recontact the [treating physician] for clarification of the reasons for the opinion.'" (quoting Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *6 (S.S.A. July 2, 1996))); *Ewald v. Comm'r of Soc. Sec.*, No. CV-05-4583 (FB), 2006 WL 3240516, at *2 (E.D.N.Y. Nov. 9, 2006) ("[E]ven if correct evaluation of the medical records revealed inadequate support for [the treating physician's] opinion, the ALJ's duty was to recontact [the treating physician] . . . to fully develop the record."); *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004) ("It is not enough for the ALJ to simply say that [the treating physician's] findings are inconsistent with the rest of the record.").

In sum, the Court concludes that clarification from Dr. Richstone was necessary to assist the ALJ in determining whether or not plaintiff is disabled. In light of the ALJ's affirmative duty to develop the record and the need to clarify the bases for Dr. Richstone's opinion regarding his urinary infrequency and urgency, incontinence, recurring kidney stones and severity of symptoms, the ALJ had a duty to recontact Dr. Richstone. On remand, the ALJ is directed to recontact Dr. Richstone for clarification of his opinions, and, to the extent necessary, further develop the record to obtain any additional information regarding plaintiff's condition during the relevant time period.

IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. The case is remanded to the ALJ for further

---

[9] The Court notes that nowhere in defendant's briefing does she address the issue of the ALJ's failure to recontact Dr. Richstone.

proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 14, 2015
Central Islip, NY

\*\*\*

Plaintiff is represented by Aba Heiman of Fusco, Brandenstein & Rada, P.C., 180 Froehlich Farm Boulevard, Woodbury, NY 11797. The Commissioner is represented by Kelly T. Currie, Acting United States Attorney, Eastern District of New York, by Robert W. Schumacher, II, 610 Federal Plaza, Central Islip, NY 11722.